POMERANTZ LLP
Jennifer Pafiti (SBN 282790)
1100 Glendon Avenue, 15th Floor
Los Angeles, California 90024
Telephone: (310) 405-7190
jpafiti@pomlaw.com

*Attorney for Plaintiff*

*[Additional Counsel on Signature Page]*

## UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| ELENA C. QUARFORD, Individually and on Behalf of All Others Similarly Situated,<br><br>     Plaintiff,<br><br>     v.<br><br>DERMTECH, INC., JOHN DOBAK, and KEVIN SUN,<br><br>     Defendants. | Case No. **'23 CV 2221 JES DDL**<br><br>CLASS ACTION<br><br>CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS<br><br>DEMAND FOR JURY TRIAL |

Plaintiff Elena C. Quarford ("Plaintiff"), individually and on behalf of all others similarly situated, by and through Plaintiff's attorneys, alleges the following upon information and belief, except as to those allegations concerning Plaintiff, which are alleged upon personal knowledge. Plaintiff's information and belief is based upon, among other things, the investigation conducted by and through Plaintiff's attorneys, which includes without limitation: (a) review and analysis of regulatory filings made by DermTech, Inc. ("DermTech" or the "Company") with the United States ("U.S.") Securities and Exchange Commission ("SEC"); (b) review and analysis of press releases and media reports issued and disseminated by DermTech; and (c) review of other publicly available information concerning DermTech.

## NATURE OF THE ACTION

1.      This is a class action on behalf of persons and entities that purchased or otherwise acquired DermTech securities between March 8, 2021 and November 3, 2022, inclusive (the "Class Period"). Plaintiff pursues claims against the Defendants under the Securities Exchange Act of 1934 (the "Exchange Act").

2.      DermTech is a molecular diagnostic company that develops and markets non-invasive genomics tests to aid the diagnosis and management of skin cancer, inflammatory skin diseases, and aging-related skin conditions. The DermTech Melanoma Test ("DMT"), formerly known as the Pigmented Lesion

Assay ("PLA") test, is the Company's commercial test offered to assess pigmented skin lesions for melanoma.

3.      Throughout the Class Period, Defendants made materially false and/or misleading statements, as well as failed to disclose material adverse facts about the Company's business, operations, and prospects.  Specifically, Defendants failed to disclose to investors that: (i) increased adoption momentum for DMT was likely to result in payor tactics to impede that momentum and/or more limited commercial payor coverage for DMT; (ii) accordingly, the Company experienced challenges with collections from commercial payors; (iii) as a result, there was a lower average selling price ("ASP") for DMT; (iv) as a result of the foregoing, the Company's revenue growth would be adversely impacted; (v) accordingly, Defendants overstated the strength and/or effectiveness of the Company's strategy for securing broad reimbursement coverage for its assays; and (vi) as a result of the foregoing, Defendants' positive statements about the Company's business, operations, and prospects were materially misleading and/or lacked a reasonable basis.

4.      On August 8, 2022, during after-market hours, DermTech announced its second quarter 2022 financial results and revealed that the Company expected "a lower [ASP] for [its] DMT" due to "Medicare billing code edits . . . as well as less favorable collection patterns from commercial payors."

5.      On this news, DermTech's stock price fell $2.87 per share, or 34%, to close at $5.56 per share on August 9, 2022, on unusually heavy trading volume.

6.      Then, on November 3, 2022, during after-market hours, DermTech announced its third quarter 2022 financial results, reporting that billable sample volume "sequential growth was flat due to headwinds caused by limited commercial payer coverage."  Company management attributed the disappointing growth to "commercial payer collection challenges [that have] affect[ed] estimating ASP", while further disclosing that "growth in utilization with certain customers is tempered because of typical payor tactics to impede [DMT's] adoption momentum."  As a result, DermTech expected "at least $13 million in assay revenue for the full-year 2022," which is "below [its] previous guidance range."

7.      On this news, DermTech's stock price fell $1.34 per share, or 44.7%, to close at $1.66 per share on November 4, 2022, on unusually heavy trading volume.

8.      As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's securities, Plaintiff and other Class members have suffered significant losses and damages.

## **JURISDICTION AND VENUE**

9.      The claims asserted herein arise under Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b), 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. § 240.10b-5).

10.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331 and Section 27 of the Exchange Act (15 U.S.C. § 78aa).

11.     Venue is proper in this Judicial District pursuant to 28 U.S.C. § 1391(b) and Section 27 of the Exchange Act (15 U.S.C. § 78aa(c)).  Substantial acts in furtherance of the alleged fraud or the effects of the fraud have occurred in this Judicial District.  Many of the acts charged herein, including the dissemination of materially false and/or misleading information, occurred in substantial part in this Judicial District.  In addition, the Company's principal executive offices are in this Judicial District.

12.     In connection with the acts, transactions, and conduct alleged herein, Defendants directly and indirectly used the means and instrumentalities of interstate commerce, including the U.S. mail, interstate telephone communications, and the facilities of a national securities exchange.

## **PARTIES**

13.     Plaintiff, as set forth in the accompanying Certification, incorporated by reference herein, purchased DermTech securities during the Class Period and suffered damages as a result of the federal securities law violations and false and/or misleading statements and/or material omissions alleged herein.

14.     Defendant DermTech is a Delaware corporation with principal executive offices located at 12340 El Camino Real, San Diego, California 92130. DermTech's common stock trades in an efficient market on the Nasdaq Capital Market ("NASDAQ") under the symbol "DMTK".

15.     Defendant John Dobak ("Dobak") served as DermTech's Chief Executive Officer at all relevant times.

16.     Defendant Kevin Sun ("Sun") has served as DermTech's Chief Financial Officer at all relevant times.

17.     Defendants Dobak and Sun (collectively, the "Individual Defendants"), because of their positions with the Company, possessed the power and authority to control the contents of the Company's reports to the SEC, press releases and presentations to securities analysts, money and portfolio managers and institutional investors, *i.e.*, the market.  The Individual Defendants were provided with copies of the Company's reports and press releases alleged herein to be misleading prior to, or shortly after, their issuance and had the ability and

opportunity to prevent their issuance or cause them to be corrected.  Because of their positions and access to material non-public information available to them, the Individual Defendants knew that the adverse facts specified herein had not been disclosed to, and were being concealed from, the public, and that the positive representations which were being made were then materially false and/or misleading.  The Individual Defendants are liable for the false statements pleaded herein.

18.    DermTech and the Individual Defendants are collectively referred to herein as "Defendants".

## SUBSTANTIVE ALLEGATIONS

## Background

19.    DermTech is a molecular diagnostic company that develops and markets non-invasive genomics tests to aid the diagnosis and management of skin cancer, inflammatory skin diseases, and aging-related skin conditions.  DMT, formerly known as the PLA test, is the Company's commercial test offered to assess pigmented skin lesions for melanoma.

## Materially False and Misleading Statements Issued During the Class Period

20.    The Class Period begins on March 8, 2021, the first trading day after DermTech filed its annual report on Form 10-K with the SEC during after-market hours, reporting the Company's financial and operational results for the quarter and

year ended December 31, 2020 (the "2020 10-K"). With respect to DermTech's strategy for "[s]ecur[ing] broad reimbursement coverage for [its] assays", the 2020 10-K stated, in relevant part:

> We have targeted regional and national payors to secure favorable coverage decisions for the reimbursement of our tests. The PLA has completed the necessary analytical validity, clinical validity, and clinical utility studies that payors require molecular tests to undertake. We have also published a United States health economic impact study on the PLA in JAMA Dermatology, which shows that the PLA significantly reduces the relative cost to assess a pigmented lesion.
>
> * * *
>
> In March 2019, MolDX, which performs technology assessments for genomic tests, issued a favorable Draft LCD for the PLA. In late October 2019, the AMA provided us with the PLA Code. Pricing of $760 for the PLA Code was released on December 24, 2019 as part of the CLFS for 2020. The Final LCD, first made available on December 26, 2019, expanded the coverage proposal in the Draft LCD from one test per date of service to two tests per date of service, and allows clinicians to order our PLA if they have sufficient skill and experience to decide whether a pigmented lesion should be biopsied or assessed by our PLA. Our PLA became eligible for Medicare reimbursement on February 10, 2020. Our local Medicare Administrative Contractor, Noridian, relies upon MolDX for technology assessments of genomic-based tests and has adopted the Final LCD issued by MolDX. Noridian has issued its own LCD announcing coverage of our PLA. Even though the effective date of Noridian's LCD is June 7, 2020, Noridian began reimbursing us for our PLA as of February 10, 2020.
>
> In addition to our demonstrated clinical validity, clinical utility is the most important attribute of a test for establishing coverage policies with payors because it demonstrates how frequently physicians adhere to the recommendation of the test and the resulting improvement in clinical outcomes. In 2020, we completed and published our largest clinical utility study of the PLA based on real-world commercial usage. This most recent clinical utility study on 3,418 cases corroborates earlier

CLASS ACTION COMPLAINT

7

utility studies and demonstrates that clinicians adhere to the recommendation of the PLA more than 98% of the time. Our test significantly reduces surgical procedures and improves the diagnostic pathway for pigmented lesion assessment. Lesions clinically suspicious for melanoma have negative PLA results in over 90% of cases, leading to an approximately 90% reduction in surgical biopsies in our 2020 study. In January of 2021, we published additional registry study data highlighting that PLA use enriches biopsied samples for melanoma almost 5-fold. We believe our body of clinical evidence and utility will lead to securing coverage policies from the major commercial payors over the next 24 to 36 months, although no assurances can be given that any reimbursement coverage approvals will be obtained.

We have secured several contracts with major preferred provider networks, including Blue Shield of California, Blue Cross and Blue Shield of Texas, Blue Cross and Blue Shield of Illinois, Carefirst - BCBS of Maryland and Priority Healthcare of Michigan. We have submitted clinical and technology assessment packages to eviCore healthcare, LLC, which provides consultative services for payors. We are in direct discussion with several national commercial payors, including Aetna, Cigna Corporation, UnitedHealthcare, Humana and several independent Blue plans, all of which have the PLA currently under review.

21.    Appended as an exhibit to the 2020 10-K were signed certifications pursuant to the Sarbanes-Oxley Act of 2002 ("SOX"), wherein the Individual Defendants certified that "[t]he [2020 10-K] fully complies with the requirements of Section 13(a) or 15(d) of the [Exchange Act]" and that "[t]he information contained in the [2020 10-K] fairly presents, in all material respects, the financial condition and results of operations of the Company."

22.    On May 13, 2021, DermTech issued a press release announcing its first quarter 2021 financial results (the "1Q21 Press Release"), which stated, in relevant part:

**First Quarter 2021 Highlights**

- Billable sample volume of approximately 9,400 for the first quarter of 2021, a 62% increase compared to approximately 5,800 recorded for the first quarter of 2020 and a 13% sequential increase over the fourth quarter of 2020.
- Assay revenue of $2.2 million for the first quarter of 2021, a 175% increase compared to the first quarter of 2020 and a 40% sequential increase over the fourth quarter of 2020.
- Total revenue of $2.5 million for the first quarter of 2021, a 62% increase compared to the first quarter of 2020 and a 19% sequential increase over the fourth quarter of 2020.
- Achieved first full quarter with positive assay gross margin of 10% compared to negative 46% for the same period of 2020.

\* \* \*

- Commercial payor contracts with Blue Shield of California, Blue Cross Blue Shield of Illinois and Blue Cross Blue Shield of Texas became effective, contributing to [ASP] improvement.

23.    The 1Q21 Press Release also quoted Defendant Dobak, who represented, in relevant part:

Q1 was a very busy quarter for DermTech with . . . the addition of non-invasive genomic patch testing, like the PLA, to the NCCN guidelines, and the effectiveness of our new contracts with major Blues plans in California, Texas and Illinois, which fueled strong assay revenue growth even during the height of the pandemic . . . . Data from the Optum economic study further confirms the cost saving potential of our technology, and we are optimistic that it will help in our efforts with commercial payors. Access to physician offices continues to be

CLASS ACTION COMPLAINT
9

challenging but we are starting to see some improvements, and we believe the recent launch of our PLA*plus* will help drive adoption.

24.     On August 4, 2021, DermTech issued a press release announcing its second quarter 2021 financial results (the "2Q21 Press Release"), which stated, in relevant part:

**Second Quarter 2021 Highlights**

- Billable sample volume of approximately 11,750 for the second quarter of 2021, a 267% increase compared to approximately 3,200 recorded for the second quarter of 2020 and a 25% sequential increase over the first quarter of 2021.
- Assay revenue of $2.9 million for the second quarter of 2021, a 349% increase compared to the second quarter of 2020 and a 33% sequential increase over the first quarter of 2021.
- Total revenue of $3.1 million for the second quarter of 2021, a 269% increase compared to the second quarter of 2020 and a 24% sequential increase over the first quarter of 2021.
- Achieved second consecutive full quarter with positive assay gross margin of 11% compared to negative 118% for the same period of 2020.

25.     The 2Q21 Press Release also quoted Defendant Dobak, who represented:

DermTech continued to execute on its core business drivers during Q2 by delivering healthy sample volume and revenue growth as we began to emerge from the peak of the pandemic . . . . Our recent efforts to complete the sales force expansion planning, the start of our in-market beta testing of our telemedicine solution, DermTech ConnectTM, and the initiation of a couple of integrated primary network pilots, enables additional adoption of [DMT] and lays the commercial foundation for future products and channel expansion.

26.     On November 9, 2021, DermTech issued a press release announcing its third  quarter 2021 financial results (the "3Q21 Press Release"), which stated, in relevant part:

**Third Quarter 2021 Highlights**

- Billable sample volume of approximately 11,720 for the third quarter of 2021, a 75% increase compared to approximately 6,700 recorded for the third quarter of 2020 and flat sequentially compared to the second quarter of 2021.
- Assay revenue of $3.0 million for the third quarter of 2021, a 140% increase compared to the third quarter of 2020 and a 2% sequential increase over the second quarter of 2021.
- Total revenue of $3.0 million for the third quarter of 2021, a 122% increase compared to the third quarter of 2020 and a 3% sequential decrease compared to the second quarter of 2021.

27.     The 3Q21 Press Release also quoted Defendant Dobak, who represented, in relevant part:

I'm proud of how we continued to execute against our growth drivers in the third quarter, despite a challenging macro-environment. We have built out our sales force, successfully completed a pilot with one primary care network and expanded a pilot with another . . . . With these building blocks in place, we feel well-positioned to continue moving forward with our initiatives and drive revenues as business environments improve.

28.     On March 1, 2022, DermTech issued a press release announcing its fourth quarter and full year 2021 financial results (the "4Q/FY21 Press Release"), which stated, in relevant part:

**Fourth Quarter and Full Year 2021 Highlights**

- Billable sample volume of approximately 11,780 for the fourth quarter of 2021, a 42% increase compared to approximately 8,300 recorded for the fourth quarter of 2020. Billable sample volume for the full year 2021 of approximately 44,620, an 86% increase compared to 2020.
- Assay revenue of $3.0 million for the fourth quarter of 2021, a 90% increase compared to the fourth quarter of 2020. Assay revenue for the full year of 2021 of $11.0 million, a 160% increase compared to 2020.
- Total revenue of $3.2 million for the fourth quarter of 2021, a 49% increase compared to the fourth quarter of 2020. Total revenue for the full year of 2021 of $11.8 million, a 101% increase compared to 2020.

29.     The 4Q/FY21 Press Release also quoted Defendant Dobak, who represented:

We are pleased with our fourth quarter and full year 2021 performance despite the various headwinds created by the pandemic. In 2021, we substantially scaled our commercial, operations, payor, and development teams. This will enable our ability to capture the promising market opportunities our Smart Sticker™ genomics platform addresses . . . . We look forward to making significant progress in 2022, which will be our first year of commercialization with a fully resourced sales and marketing organization.

30.     On March 10, 2022, DermTech filed an annual report on Form 10-K with the SEC, reporting the Company's financial and operational results for the quarter and year ended December 31, 2021 (the "2021 10-K"). The 2021 10-K contained substantively the same statements as referenced in ¶ 20, *supra*, regarding DermTech's strategy for "[s]ecur[ing] broad reimbursement coverage for [its] assays."

31.     Appended as an exhibit to the 2021 10-K were substantively the same SOX certifications as referenced in ¶ 21, *supra*, signed by the Individual Defendants.

32.     On May 3, 2022, DermTech issued a press release announcing its first quarter 2022 financial results (the "1Q22 Press Release"), which stated, in relevant part:

**First-Quarter 2022 Financial Results**

- Billable sample volume grew 53 percent from the first quarter of 2021 to approximately 14,370.
- Assay revenue was $3.5 million, up 61 percent from the first quarter of 2021, primarily due to higher billable sample volume.
- Total revenue was $3.7 million, a 47 percent increase from the first quarter of 2021, driven by higher assay revenue.

* * *

**2022 Outlook**

The Company affirmed its full-year 2022 outlook for assay revenue between $22 million and $26 million.

33.     The 1Q22 Press Release also quoted Defendant Dobak, who represented:

We kicked off the year on a record pace for many of our key operating metrics and affirmed our full-year 2022 outlook . . . . We also added a payor contract during the first quarter bringing our total covered U.S. lives to approximately 91 million. Overall, we believe we have excellent long-term growth prospects and that 2022 will be a transformational year as we leverage our commercial scale to address the urgent need to improve the early detection of melanoma.

CLASS ACTION COMPLAINT
13

34.    The statements referenced in ¶¶ 20-33 were materially false and/or misleading and failed to disclose material adverse facts about the Company's business, operations, and prospects.  Specifically, Defendants failed to disclose to investors that: (i) increased adoption momentum for DMT was likely to result in payor tactics to impede that momentum and/or more limited commercial payor coverage for DMT; (ii) accordingly, the Company experienced challenges with collections from commercial payors; (iii) as a result, there was a lower ASP for DMT; (iv) as a result of the foregoing, the Company's revenue growth would be adversely impacted; (v) accordingly, Defendants overstated the strength and/or effectiveness of the Company's strategy for securing broad reimbursement coverage for its assays; and (vi) as a result of the foregoing, Defendants' positive statements about the Company's business, operations, and prospects were materially misleading and/or lacked a reasonable basis.

**The Truth Begins to Emerge**

35.    On August 8, 2022, during after-market hours, DermTech issued a press release announcing its second quarter 2022 financial results (the "2Q22 Press Release") and revealed that the Company expected "a lower [ASP] for [its] DMT" due to "Medicare billing code edits . . . as well as less favorable collection patterns from commercial payors."

CLASS ACTION COMPLAINT
14

36.     On this news, DermTech's stock price fell $2.87 per share, or 34%, to close at $5.56 per share on August 9, 2022, on unusually heavy trading volume. Despite this decline in the Company's stock price, DermTech securities continued trading at artificially inflated prices throughout the remainder of the Class Period because of Defendants' continued misstatements and omissions regarding challenges with collections from commercial payors and the likely negative impact this would have on the Company's revenue growth.

37.     For example, the 2Q22 Press Release stated that "[t]he Company updated its full-year 2022 outlook for assay revenue and now expects between $16 million and $19 million."   The 2Q22 Press Release also reported the following second quarter 2022 financial results:

**Second-Quarter 2022 Financial Results**

- Billable sample volume grew 56 percent from the second quarter of 2021 to approximately 18,320.
- Assay revenue was $4.1 million, up 43 percent from the second quarter of 2021, primarily due to higher billable sample volume.
- Total revenue was $4.2 million, a 36 percent increase from the second quarter of 2021, driven by higher assay revenue.
- Cost of assay revenue was $3.2 million, a 24 percent increase from the second quarter of 2021, yielding an assay gross margin of 22%, compared to 11% for the second quarter of 2021.

38.     The statements referenced in ¶ 37 were materially false and/or misleading and failed to disclose material adverse facts about the Company's business, operations, and prospects.  Specifically, Defendants failed to disclose to

investors that: (i) increased adoption momentum for DMT was likely to result in payor tactics to impede that momentum and/or more limited commercial payor coverage for DMT; (ii) accordingly, the Company experienced challenges with collections from commercial payors; (iii) as a result, there was a lower ASP for DMT; (iv) as a result of the foregoing, the Company's revenue growth would be adversely impacted; (v) accordingly, Defendants overstated the strength and/or effectiveness of the Company's strategy for securing broad reimbursement coverage for its assays; and (vi) as a result of the foregoing, Defendants' positive statements about the Company's business, operations, and prospects were materially misleading and/or lacked a reasonable basis.

### **The Truth Fully Emerges**

39.     On November 3, 2022, during after-market hours, DermTech issued a press release announcing its third quarter 2022 financial results (the "3Q22 Press Release"), in which the Company reported that billable sample volume "sequential growth was flat due to headwinds caused by limited commercial payer coverage." Company management attributed the disappointing growth to "commercial payer collection challenges [that have] affect[ed] estimating ASP", while further disclosing that "growth in utilization with certain customers is tempered because of typical payor tactics to impede [DMT's] adoption momentum."  As a result, DermTech expected "at least $13 million in assay revenue for the full-year 2022," which is "below [its]

previous guidance range." Specifically, the 3Q22 Press Release stated, in relevant part:

> "We achieved meaningful year-over-year billable sample volume growth, but ***sequential growth was flat due to headwinds caused by limited commercial payer coverage***," said [Defendant] Dobak, M.D., CEO, DermTech. "Despite these challenges, we have more positive activity with payers now than we've ever had and are confident we're on the path to meaningfully growing covered lives in the U.S. We remain closely engaged with commercial payers and believe that we'll potentially add 30 to 40 million covered lives by the end of the first quarter of 2023. We've recently executed an agreement with a large regional payer and have received an excellent policy from a prominent laboratory benefits manager. We've also completed price negotiations with a national government payer that runs the largest integrated health care system in the U.S. We've spent productive time with national payer medical directors and have several scheduled comprehensive reviews with medical policy teams in the upcoming months, which we see as additional, important potential business catalysts."

> D[efendant] Dobak continued, "We believe the value proposition of [DMT] continues to be embraced by our customers, but ***growth in utilization with certain customers is tempered because of typical payor tactics to impede our adoption momentum. Due to these factors, we expect to finish 2022 below our previous guidance range. It's difficult to provide a revised forecast due to commercial payer collection challenges which affect estimating ASP and the potential for additional changes in estimates for anticipated cash collections, but we do expect to achieve at least $13 million in assay revenue for the full-year 2022***."

> \* \* \*

> **Third-Quarter 2022 Financial Results**
>
> - Billable sample volume grew 54 percent from the third quarter of 2021 to approximately 18,080.
> - Assay revenue was $3.4 million, up 16 percent from the third quarter of 2021, primarily due to higher billable sample volume.

- Total revenue was $3.6 million, an 18 percent increase from the third quarter of 2021, driven by higher assay revenue.

(Emphases added.)

40.    On this news, DermTech's stock price fell $1.34 per share, or 44.7%, to close at $1.66 per share on November 4, 2022, on unusually heavy trading volume.

## PLAINTIFF'S CLASS ACTION ALLEGATIONS

41.    Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a class, consisting of all persons and entities that purchased or otherwise acquired DermTech securities during the Class Period, and who were damaged thereby (the "Class").  Excluded from the Class are Defendants, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors, or assigns, and any entity in which Defendants have or had a controlling interest.

42.    The members of the Class are so numerous that joinder of all members is impracticable.  Throughout the Class Period, DermTech's shares actively traded on the NASDAQ.  While the exact number of Class members is unknown to Plaintiff at this time and can only be ascertained through appropriate discovery, Plaintiff believes that there are at least hundreds or thousands of members in the proposed Class.  Millions of DermTech shares were traded publicly during the

Class Period on the NASDAQ.  Record owners and other members of the Class may be identified from records maintained by DermTech or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

43.    Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

44.    Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation.

45.    Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.  Among the questions of law and fact common to the Class are:

a)    whether the federal securities laws were violated by Defendants' acts as alleged herein;

b)    whether statements made by Defendants to the investing public during the Class Period omitted and/or misrepresented material facts about the business, operations, and prospects of DermTech; and

c)    to what extent the members of the Class have sustained damages and the proper measure of damages.

46.     A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation makes it impossible for members of the Class to individually redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

47.     The market for DermTech's securities was open, well-developed and efficient at all relevant times.  As a result of the materially false and/or misleading statements and/or failures to disclose, DermTech's securities traded at artificially inflated prices during the Class Period.  Plaintiff and other members of the Class purchased or otherwise acquired the Company's securities relying upon the integrity of the market price of DermTech's securities and market information relating to DermTech, and have been damaged thereby.

48.     During the Class Period, the artificial inflation of DermTech's shares was caused by the material misrepresentations and/or omissions particularized in this Complaint causing the damages sustained by Plaintiff and other members of the Class.  As described herein, during the Class Period, Defendants made or caused to be made a series of materially false and/or misleading statements about DermTech's business, prospects, and operations.  These material misstatements and/or omissions created an unrealistically positive assessment of DermTech and its

business, operations, and prospects, thus causing the price of the Company's securities to be artificially inflated at all relevant times, and when disclosed, negatively affected the value of the Company's shares. Defendants' materially false and/or misleading statements during the Class Period resulted in Plaintiff and other members of the Class purchasing the Company's securities at such artificially inflated prices, and each of them has been damaged as a result.

49. At all relevant times, the market for DermTech's securities was an efficient market for the following reasons, among others:

a) DermTech shares met the requirements for listing, and were listed and actively traded on the NASDAQ, a highly efficient and automated market;

b) As a regulated issuer, DermTech filed periodic public reports with the SEC and/or the NASDAQ;

c) DermTech regularly communicated with public investors via established market communication mechanisms, including through regular dissemination of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and/or

d) DermTech was followed by securities analysts employed by brokerage firms who wrote reports about the Company, and these reports were

distributed to the sales force and certain customers of their respective brokerage firms.    Each of these reports was publicly available and entered the public marketplace.

50.    As a result of the foregoing, the market for DermTech's securities promptly digested current information regarding DermTech from all publicly available sources and reflected such information in DermTech's share price.  Under these circumstances, all purchasers of DermTech's securities during the Class Period suffered similar injury through their purchase of DermTech's securities at artificially inflated prices and a presumption of reliance applies.

51.    A Class-wide presumption of reliance is also appropriate in this action under the Supreme Court's holding in *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972), because the Class's claims are, in large part, grounded on Defendants' material misstatements and/or omissions.  Because this action involves Defendants' failure to disclose material adverse information regarding the Company's business operations and financial prospects—information that Defendants were obligated to disclose—positive proof of reliance is not a prerequisite to recovery.  All that is necessary is that the facts withheld be material in the sense that a reasonable investor might have considered them important in making investment decisions.  Given the importance of the Class Period material misstatements and omissions set forth above, that requirement is satisfied here.

## **UNDISCLOSED ADVERSE FACTS**

52.   The market for DermTech's securities was open, well-developed and efficient at all relevant times.  As a result of the materially false and/or misleading statements and/or failures to disclose, as alleged herein, DermTech's securities traded at artificially inflated prices during the Class Period.  Plaintiff and other members of the Class purchased or otherwise acquired DermTech's securities relying upon the integrity of market price of the Company's securities and market information relating to DermTech, and have been damaged thereby.

53.   During the Class Period, Defendants materially misled the investing public, thereby inflating the price of DermTech's securities, by publicly issuing false and/or misleading statements and/or omitting to disclose material facts necessary to make Defendants' statements, as set forth herein, not false and/or misleading.  The statements and omissions were materially false and/or misleading because they failed to disclose material adverse information and/or misrepresented the truth about DermTech's business, operations, and prospects, as alleged herein.

54.   At all relevant times, the material misrepresentations and omissions particularized in this Complaint directly or proximately caused or were a substantial contributing cause of the damages sustained by Plaintiff and other members of the Class.  As described herein, during the Class Period, Defendants made or caused to be made a series of materially false and/or misleading statements

about DermTech's financial well-being and prospects. These material misstatements and/or omissions had the cause and effect of creating in the market an unrealistically positive assessment of the Company and its financial well-being and prospects, thus causing the Company's securities to be overvalued and artificially inflated at all relevant times. Defendants' materially false and/or misleading statements during the Class Period resulted in Plaintiff and other members of the Class purchasing the Company's securities at artificially inflated prices, thus causing the damages complained of herein when the truth was revealed.

## LOSS CAUSATION

55.    Defendants' wrongful conduct, as alleged herein, directly and proximately caused the economic loss suffered by Plaintiff and the Class.

56.    During the Class Period, Plaintiff and the Class purchased DermTech's securities at artificially inflated prices and were damaged thereby. The price of the Company's securities significantly declined when the misrepresentations made to the market, and/or the information alleged herein to have been concealed from the market, and/or the effects thereof, were revealed, causing investors' losses.

## SCIENTER ALLEGATIONS

57.    As alleged herein, Defendants acted with scienter since Defendants knew that the public documents and statements issued or disseminated in the name

of the Company were materially false and/or misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the federal securities laws. As set forth elsewhere herein in detail, the Individual Defendants, by virtue of their receipt of information reflecting the true facts regarding DermTech, their control over, and/or receipt and/or modification of DermTech's allegedly materially misleading misstatements and/or their associations with the Company which made them privy to confidential proprietary information concerning DermTech, participated in the fraudulent scheme alleged herein.

## **NO SAFE HARBOR**

58.    The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this Complaint. The statements alleged to be false and misleading herein all relate to then-existing facts and conditions. In addition, to the extent certain of the statements alleged to be false may be characterized as forward-looking, they were not identified as "forward-looking statements" when made and there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements. In the alternative, to the extent that the statutory safe harbor is

determined to apply to any forward-looking statements pleaded herein, Defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements was made, the speaker had actual knowledge that the forward-looking statement was materially false or misleading, and/or the forward-looking statement was authorized or approved by an executive officer of DermTech who knew that the statement was false when made.

## COUNT I

**(Violations of Section 10(b) of the Exchange Act and Rule 10b-5 Promulgated Thereunder Against All Defendants)**

59.    Plaintiff repeats and re-alleges each and every allegation contained above as if fully set forth herein.

60.    During the Class Period, Defendants carried out a plan, scheme and course of conduct which was intended to and, throughout the Class Period, did: (i) deceive the investing public, including Plaintiff and other Class members, as alleged herein; and (ii) cause Plaintiff and other members of the Class to purchase DermTech's securities at artificially inflated prices.  In furtherance of this unlawful scheme, plan and course of conduct, Defendants, and each defendant, took the actions set forth herein.

61.    Defendants (i) employed devices, schemes, and artifices to defraud; (ii) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (iii) engaged in acts,

practices, and a course of business which operated as a fraud and deceit upon the purchasers of the Company's securities in an effort to maintain artificially high market prices for DermTech's securities in violation of Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder. All Defendants are sued either as primary participants in the wrongful and illegal conduct charged herein or as controlling persons as alleged below.

62.    Defendants, individually and in concert, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct to conceal adverse material information about DermTech's financial well-being and prospects, as specified herein.

63.    Defendants employed devices, schemes and artifices to defraud, while in possession of material adverse non-public information and engaged in acts, practices, and a course of conduct as alleged herein in an effort to assure investors of DermTech's value and performance and continued substantial growth, which included the making of, or the participation in the making of, untrue statements of material facts and/or omitting to state material facts necessary in order to make the statements made about DermTech and its business operations and future prospects in light of the circumstances under which they were made, not misleading, as set forth more particularly herein, and engaged in transactions, practices and a course

of business which operated as a fraud and deceit upon the purchasers of the Company's securities during the Class Period.

64.     Each of the Individual Defendants' primary liability and controlling person liability arises from the following facts: (i) the Individual Defendants were high-level executives and/or directors at the Company during the Class Period and members of the Company's management team or had control thereof; (ii) each of these defendants, by virtue of their responsibilities and activities as a senior officer and/or director of the Company, was privy to and participated in the creation, development and reporting of the Company's internal budgets, plans, projections and/or reports; (iii) each of these defendants enjoyed significant personal contact and familiarity with the other defendants and was advised of, and had access to, other members of the Company's management team, internal reports and other data and information about the Company's finances, operations, and sales at all relevant times; and (iv) each of these defendants was aware of the Company's dissemination of information to the investing public which they knew and/or recklessly disregarded was materially false and misleading.

65.     Defendants had actual knowledge of the misrepresentations and/or omissions of material facts set forth herein, or acted with reckless disregard for the truth in that they failed to ascertain and to disclose such facts, even though such facts were available to them.  Such defendants' material misrepresentations and/or

omissions were done knowingly or recklessly and for the purpose and effect of concealing DermTech's financial well-being and prospects from the investing public and supporting the artificially inflated price of its securities.   As demonstrated by Defendants' overstatements and/or misstatements of the Company's business, operations, financial well-being, and prospects throughout the Class Period, Defendants, if they did not have actual knowledge of the misrepresentations and/or omissions alleged, were reckless in failing to obtain such knowledge by deliberately refraining from taking those steps necessary to discover whether those statements were false or misleading.

66.   As a result of the dissemination of the materially false and/or misleading information and/or failure to disclose material facts, as set forth above, the market price of DermTech's securities was artificially inflated during the Class Period.   In ignorance of the fact that market prices for the Company's securities were artificially inflated, and relying directly or indirectly on the false and misleading statements made by Defendants, or upon the integrity of the market in which the securities trade, and/or in the absence of material adverse information that was known to or recklessly disregarded by Defendants, but not disclosed in public statements by Defendants during the Class Period, Plaintiff and the other members of the Class acquired DermTech's securities during the Class Period at artificially high prices and were damaged thereby.

67.     At the time of said misrepresentations and/or omissions, Plaintiff and other members of the Class were ignorant of their falsity, and believed them to be true.  Had Plaintiff and the other members of the Class and the marketplace known the truth regarding the problems that DermTech was experiencing, which were not disclosed by Defendants, Plaintiff and other members of the Class would not have purchased or otherwise acquired their DermTech securities, or, if they had acquired such securities during the Class Period, they would not have done so at the artificially inflated prices which they paid.

68.     By virtue of the foregoing, Defendants violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

69.     As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their respective transactions in the Company's securities during the Class Period.

## **COUNT II**

**(Violations of Section 20(a) of the Exchange Act Against the Individual Defendants)**

70.     Plaintiff repeats and re-alleges each and every allegation contained above as if fully set forth herein.

71.     The Individual Defendants acted as controlling persons of DermTech within the meaning of Section 20(a) of the Exchange Act as alleged herein.  By

virtue of their high-level positions and their ownership and contractual rights, participation in, and/or awareness of the Company's operations and intimate knowledge of the false financial statements filed by the Company with the SEC and disseminated to the investing public, the Individual Defendants had the power to influence and control and did influence and control, directly or indirectly, the decision-making of the Company, including the content and dissemination of the various statements which Plaintiff contends are false and misleading.    The Individual Defendants were provided with or had unlimited access to copies of the Company's reports, press releases, public filings, and other statements alleged by Plaintiff to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

72.    In particular, the Individual Defendants had direct and supervisory involvement in the day-to-day operations of the Company and, therefore, had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein, and exercised the same.

73.    As set forth above, Defendants each violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder by their acts and omissions as alleged in this Complaint.  By virtue of their position as controlling persons, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act.  As

a direct and proximate result of Defendants' wrongful conduct, Plaintiff and other members of the Class suffered damages in connection with their purchases of the Company's securities during the Class Period.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff prays for relief and judgment, as follows:

A.    Determining that this action is a proper class action under Rule 23 of the Federal Rules of Civil Procedure;

B.    Awarding compensatory damages in favor of Plaintiff and the other Class members against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

C.    Awarding Plaintiff and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

D.    Such other and further relief as the Court may deem just and proper.

## DEMAND FOR TRIAL BY JURY

Plaintiff hereby demands a trial by jury.

Dated:  December 5, 2023              Respectfully submitted,

                                     POMERANTZ LLP

                                     */s/ Jennifer Pafiti*
                                     Jennifer Pafiti (SBN 282790)
                                     1100 Glendon Avenue, 15th Floor
                                     Los Angeles, California 90024

Telephone: (310) 405-7190
jpafiti@pomlaw.com

POMERANTZ, LLP
Jeremy A. Lieberman
(*pro hac vice* application forthcoming)
J. Alexander Hood II
(*pro hac vice* application forthcoming)
600 Third Avenue, 20th Floor
New York, New York 10016
Telephone: (212) 661-1100
Facsimile: (917) 463-1044
jalieberman@pomlaw.com
ahood@pomlaw.com

*Attorneys for Plaintiff*